**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOSEPH A. KELLY and DOUGLAS L. ANDERSON<br><br>Plaintiffs,<br><br>v.<br><br>HORSERACING INTEGRITY AND SAFETY AUTHORITY, INC., LISA LAZARUS, CHARLES SHEELER, STEVE BESHEAR, ADOLPHO BIRCH, LEONARD S. COLEMAN, JR., JOSEPH DE FRANCIS, TERRI MAZUR, SUSAN STOVER, BILL THOMASON, D.G. VAN CLIEF, FEDERAL TRADE COMMISSION, LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission, REBECCA KELLY SLAUGHTER, in her official capacity as Commissioner of the Federal Trade Commission, ALVARO BEDOYA, in his official capacity as Commissioner of the Federal Trade Commission, MELISSA HOLYOAK, in her official capacity as Commissioner of the Federal Trade Commission, ANDREW FERGUSON, in his official capacity as Commissioner of the Federal Trade Commission,<br><br>Defendants. | Civ. No. 4:24-cv-00264<br><br>**COMPLAINT** |

**INTRODUCTION**

1.     On December 27, 2020, buried near the end of an omnibus budget bill that provided for financial relief because of the COVID-19 pandemic, Congress passed a federal takeover of the thoroughbred horseracing industry by a *private* organization. Pub. L. No. 116–260, §§ 1201–12, 134 Stat. 1182, 3252–75 (2020), codified at 15 U.S.C. §§3051-3060. The legislation, known as the Horseracing Safety and Integrity Act, takes authority away from state regulatory bodies, like the Iowa Racing and Gaming Commission, and gives it to a private, independent, self-regulatory nonprofit corporation called the Horseracing Integrity and Safety Authority, or HISA.

2.     Despite wielding the power of the federal government, HISA is not funded by it. The Horseracing Integrity and Safety Act (the "Act") contains no appropriation or other government funding source. Instead, this private, independent corporation—whose board of directors is not appointed by the President or any elected official—is funded entirely by "assessments" on the states (whose power the Act is removing) or, if the states decline, the participants of the thoroughbred horseracing industry. The Act states that HISA "shall allocate equitably" a yearly assessment amongst industry participants to cover HISA's budget, and that decision is final. Although the Federal Trade Commission has some oversight authority over HISA and the rules it promulgates, the FTC does not review HISA's equitable-allocation determinations nor is there a process for the FTC to overrule them.  The decision of

how and against whom to assess this tax (or fee, as the Act calls it) is left to this private organization.

3.     There have been several legal challenges to the Act's delegation of power to HISA.  The United States Court of Appeals for the Fifth Circuit has twice declared that portions of the Act are unconstitutional under the private non-delegation doctrine; the Eighth Circuit currently has the issue under consideration; and the Sixth Circuit has upheld the Act over broad constitutional challenges. None of these cases, however, has directly addressed the Act's grant of authority to HISA to assess taxes or fees on industry participants.

4.     This case is solely about whether the Act's delegation of authority to a private entity to levy and collect a tax or a fee is constitutional and whether this private organization is even complying with the Act's requirement that any assessment be "allocated equitably."

5.     This Court should declare that the Act's funding mechanisms is unconstitutional and permanently enjoin the defendants from enforcing it. Or, in the alternative, the Court should declare that HISA's assessment against Iowa horse owners is not equitable and thus *ultra vires*.

## PARTIES

6.     Plaintiff Joseph A. Kelly is a thoroughbred racehorse owner, licensed by the Iowa Racing and Gaming Commission. In contrast to the so-called Blue Bloods— the wealthy, elite owners and breeders whose horses run almost exclusively in places

like Churchill Downs, Saratoga, and Keeneland—Kelly is a late-comer to the horseracing industry, buying his first thoroughbred race horse in 2017 after a long and distinguished career serving and protecting the public. A farm kid from rural Iowa, Kelly served 25 years in the armed forces and 29 years as a full-time firefighter in Des Moines, Iowa. Kelly served 11 years in active duty with the Army—with two tours in Operation Desert Shield/Storm as an explosive ordnance disposal team leader—and 14 years in the Army Reserve Army National Guard, where he was deployed to Iraq in 2003 as a fire chief. Kelly owns three thoroughbred horses that race and are currently stabled at Prairie Meadows Racetrack and Casino in Polk County, Iowa. He is a "covered person" under the Act and is subject to HISA's assessments. Kelly resides in Dallas County, Iowa.

7.     Plaintiff Douglas L. Anderson started his career in horse racing over 40 years ago in Nebraska, beginning as a groom and hot walk (starting level employee) and working his way through almost every position on the "backside" of the track imaginable.  Anderson has spent most of his career as a trainer but, beginning 20 years ago, also began to be a successful owner. Anderson owns two horses that race and are currently stabled at Prairie Meadows; he owns seven other horses in various partnerships. Anderson is a "covered person" under the Act and is subject to HISA's assessments. He resides in Garland County, Arkansas.

8.     Defendant Horseracing Integrity and Safety Authority, Inc. is a nonprofit corporation chartered under the laws of Delaware with its principal place of business

in Lexington, Fayette County, Kentucky. Among other things, the Act purports to delegate to HISA the power to assess taxes or fees against all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a state racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses.

9.      Defendant Lisa Lazarus is HISA's Chief Executive Officer. She oversees HISA's operations, including HISA's assessments of taxes or fees under the Act.  On information and belief, Ms. Lazarus resides in Fayette County, Lexington, Kentucky.

10.     Defendant Charles Scheeler is an independent director serving on the Board of Directors of HISA. He is a retired partner at the law firm DLA Piper. On information and belief, Scheeler resides in Towson, Baltimore County, Maryland.

11.     Defendant Steve Beshear is an independent director serving on the Board of Directors of HISA. He served as the Governor of Kentucky between 2007 and 2015. On information and belief, Mr. Beshear resides in Lexington, Fayette County, Kentucky.

12.     Defendant Adolpho Birch is an independent director serving on the Board of Directors of HISA. He is senior vice president of business affairs and the chief legal officer for the Tennessee Titans. On information and belief, Mr. Birch resides in Nashville, Davidson County, Tennessee

13.     Defendant Leonard S. Coleman, Jr. is an independent director serving on the Board of Directors of HISA. He served as the president of the National League of

Professional Baseball Clubs from 1994 to 1999. On information and belief, Coleman resides in Palm Beach, Palm Beach County, Florida.

14.     Defendant Joseph De Francis is an industry director serving on the Board of Directors HISA. He is the managing partner of Gainesville Associates, LLC. On information and belief, De Francis resides in Columbia, Howard County, Maryland.

15.     Defendant Terri Mazur is an independent director serving on the Board of Directors of HISA. She was formerly a partner Mayer Brown LLP and Arnold Porter Kaye Scholer LLP, and formerly a shareholder at Greenberg Traurig, LLP. On information and belief, Mazur resides in New York, New York.

16.     Defendant Susan Stover is an industry director serving on the Board of Directors of HISA. She is a professor of surgical and radiological sciences at the University of California, Davis, School of Veterinary Medicine. On information and belief, Stover resides in Winters, Yolo County, California.

17.     Defendant Bill Thomason is an industry director serving on the Board of Directors of the Authority. He is the former president and CEO of Keeneland Association, Inc., a Thoroughbred racetrack and horse-auction complex. On information and belief, Thomason resides in Lexington, Fayette County, Kentucky.

18.     Defendant D.G. Van Clief is an industry director serving on the Board of Directors of the Authority. He was previously president of the Breeders' Cup. On information and belief, Van Clief resides in Charlottesville, Albemarle County, Virginia.

19.     Defendant Federal Trade Commission is a U.S. governmental agency headquartered in Washington, D.C. The Act delegates to the FTC a limited power to approve or disapprove certain of the Authority's proposed regulations.

20.     Defendant Lina Khan is the chair of the FTC and is sued in her official capacity.

21.     Defendant Rebecca Kelly Slaughter is an FTC commissioner and is sued in her official capacity.

22.     Defendant Alvaro Bedoya is an FTC commissioner and is sued in his official capacity.

23.     Defendant Melissa Holyoak is an FTC commissioner and is sued in her official capacity.

24.     Defendant Andrew N. Ferguson is an FTC commissioner and is sued in his official capacity.

## JURISDICTION AND VENUE

25.     Plaintiffs are bringing claims arising under the Constitution and laws of the United States; the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, and 1361.

26.     Venue is proper under 28 U.S.C. § 1391 because it is an action against officers and an agency of the United States and because a substantial part of the events or omissions giving rise to the claims occurred here.

**FACTUAL ALLEGATIONS**

<u>The Act's Delegation of Authority to HISA to Raise and Spend Funds</u>

27.     The Horseracing Integrity and Safety Act recognizes and cloaks with federal authority the "private, independent, self-regulatory, nonprofit corporation" known as HISA to develop and implement a national horseracing "anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces." 15 U.S.C. § 3052(a)

28.     Congress did not fund HISA through an appropriation; instead, the Act gives HISA itself the authority to set its own budget and raise revenue to cover those expenses by assessing "fees" against participants in the horseracing industry or, if they are willing, the states.

29.     The Act provides that, no later than November 1 of each year, HISA must determine an estimated amount of money that is "required" from each state in which federally regulated horseracing occurs. The total amount is based on "the annual budget of [HISA] for the following calendar year" and "the projected amount of covered racing starts for the year in each State." 15 U.S.C. § 3052(f)(1).

30.     HISA may then collect each state's share from the state's racing commission, if the racing commission voluntarily elects to make such payments.  15 U.S.C. § 3052(f)(2).

31.     If "a State racing commission does not elect to remit fees" to HISA, then the Act provides that HISA "shall allocate equitably" and collect the state's required

share "among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate." 15 U.S.C. § 3052(f)(3).

32.     "Covered persons" are "*all* trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses." 15 U.S.C. § 3051(6). (emphasis added).

<u>HISA's Assessment Methodology Rule</u>

33.     HISA has not promulgated any rules for determining how it will equitably allocate an assessment against covered persons within a state.

34.     On January 7, 2022, HISA did submit to the FTC a proposed rule, which HISA called the "Assessment Methodology Rule." That rule—which the FTC approved on April 1, 2022, after only a 14-day notice-and-comment period—did not provide any formula, factors, or other guidance on how HISA will equitably allocate a state's share of the assessment among covered persons within that state. Instead, it merely requires that each racetrack provide HISA with a proposal of how the racetrack believes HISA should allocate the assessment among covered persons.[1] HISA Rule Series 8000.

---

[1] The Assessment Methodology Rule does provide a formula for how HISA will divide up the total assessment among the states, but it does not provide how HISA will equitably allocate that assessment among covered persons within the state.

35.     Specifically, HISA Rule 8520(e)(4) states that "[n]ot later than May 1, 2022 and not later than November 1 each year thereafter, each Racetrack in the State shall submit to the Authority its proposal for the allocation of the Assessment Calculation among covered persons involved with Covered Horseraces."

36.     The Rule goes on to provide that, within 30 days of the racetrack submitting its proposed "Covered Persons Allocation," HISA "shall determine whether the Covered Persons Allocation has been allocated equitably in accordance with 15 U.S.C. 3052(f)(3)(B)," the statutory provision that merely states that HISA "shall allocate equitably" the state's assessment "among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate." In other words, the Assessment Methodology Rule contains no definition, formula, or guidance, or any detail whatsoever about how or what an "equitable" assessment is.

37.     In its April 1, 2022, order approving the Assessment Methodology Rules, the FTC noted that HISA "stated that it planned to issue guidance on the subject" of how it would equitably allocate the intrastate assessment among covered persons. As of the date of the filing of this complaint, two years and four months after the FTC's order, HISA has not released any guidance on how it will equitably allocate an assessment among covered persons within a state. Nevertheless, the lack of any FTC-approved methodology has not stopped HISA from making its purported "equitable allocation" among covered persons racing in Iowa and around the country.

**HISA's Iowa Assessments and "Covered Persons Allocation"**

38.    On October 17, 2022, HISA Chief Financial Officer Jim Gates notified the Iowa Racing and Gaming Commission, the regulatory body that governs thoroughbred horseracing in Iowa, that HISA was allocating to Iowa $1,040,576 of the total assessment for 2023; HISA later reduced that amount to $953,400.

39.    The Iowa Racing and Gaming Commission elected not to remit funds to HISA to pay for the assessment so, under 15 U.S.C. § 3052(f)(3), HISA was required to "allocate equitably" the assessment "among covered persons involved with covered horseraces."

40.    On June 20, 2023, HISA President and CEO Lisa Lazarus notified Prairie Meadows Racetrack and Casino, the only horseracing track in Iowa, that HISA determined that the proposal Prairie Meadows submitted to HISA for the allocation of the assessment "among Covered Persons" had "allocated equitably" the assessment "in accordance with 15 USC 3052(f)(3)(B) and therefore, the Proposal has been approved." This "equitable allocation," as determined by HISA, "splits the assessment 50-50 between the track and horsemen."

41.    The letter did not define "horsemen," nor did it explain how the allocation was equitable.

42.    HISA did not send a copy of the letter to Plaintiffs or, upon information and belief, to anyone in the horseracing industry in Iowa, other than Prairie Meadows.

43.     On October 31, 2023, HISA CEO Lisa Lazarus sent a letter to the Iowa Racing and Gaming Commission, stating that Iowa's 2024 HISA assessment is $1,187,942, a nearly 25% increase from 2023. Lazarus urged the Iowa governmental body to voluntarily pay that sum, stating that "while we would prefer that the state fully opt-in, HISA will accept partial payments from the state if that is your preference. The letter further stated that, "[s]hould Iowa choose not to opt in, we will need the Iowa racetracks to submit their proposed Covered Person allocation for paying the assessment by December 10, 2023."

44.     Once again, the Iowa Racing and Gaming Commission—which is without state appropriation to pay the assessment, even if it wanted to—declined to make the payment.

45.     On December 28, 2023, HISA CFO Jim Gates emailed an employee of Prairie Meadows. Gates wrote:

> We haven't received a Covered Persons Allocation proposal from Prairie Meadows (these proposals were due on Dec. 10). I'm assuming you will be splitting the assessments 50-50 with your horsemen – correct? HISA's Cost Allocation Committee is planning to impose a 50-50 split on all tracks in 2024 that had a 50-50 split in 2023, so just let me know if you plan otherwise. We will be sending letters out in the next few days informing tracks of the 50-50 split for 2024, so please get back to me [i]n the next as soon as possible. [sic]

46.     Gates' letter did not say which tracks had a "50-50 split in 2023" or what HISA had determined to be equitable in any other state or for any other racetrack.

47.     The following week, on January 2, 2024, Prairie Meadows responded to Gates' letter, with the racetrack's vice president of racing stating that the Prairie Meadows' proposed allocation would be the same as the previous year.

48.     Three days later, Gates emailed Prairie Meadows a letter from HISA CEO Lazarus approving the proposal. "The Authority has determined that the Proposal equitably allocates the financial responsibilities of the Covered Persons in accordance with 15 USC 3052(f)(3)(B) and therefore, the Proposal has been approved," Lazarus wrote.

49.     Lazarus continued, stating that HISA would "in early January be sending invoices for the first of 12 monthly installments of the 2024 Assessment, with each invoice to be paid 50% by the tracks and 50% by the horsemen." "The horsemen," Lazarus stated, "may elect to pay from the purse account or via a start fee – we will assume they are paying from purses, so please contact us if you'd like to assess a start fee instead."

50.     Lazarus did not define who "horsemen" were, nor did she state how a 50/50 split between Prairie Meadows (the racetrack) and horsemen was equitable. The Iowa Horsemen's Benevolent and Protective Association (Iowa HBPA), the group at Prairie Meadow that represents thoroughbred owners and trainers at Prairie Meadows, has since sought clarification on HISA's definition of "horsemen" for purposes of the assessment; HISA has not responded.

51.     Nevertheless, in January and February 2024, HISA sent an invoice to both Prairie Meadows and the Iowa HBPA. HISA representatives stated in a phone conversation with Prairie Meadows representatives that HISA had expected the Iowa HBPA to pay the "horsemen's" half of the assessment.

52.     The Iowa HBPA is not a "covered person" under the Act and had not voluntarily agreed to pay the 2024 assessment.

53.     In June 2023, the Iowa HBPA Executive Director Jon Moss did send a letter to Prairie Meadows, stating that the Iowa HBPA was offering "to assist Prairie Meadows with the payment for the 2023 HISA Assessment" by paying "$266,842 for use against the HISA assessment of 2023," but only after "the exhaustion of the IA HBPA's legal options to fully stop the outright unconstitutional takeover of horse racing in Iowa." As of the date of this filing, the Iowa HBPA's legal challenge to the Act is still pending with the Eighth Circuit. "As you know," Moss wrote to Prairie Meadows in June 2023, "the Iowa HBPA believes the passage of Horseracing Integrity and Safety Act and the corresponding creation of a non-governmental authority to govern horseracing is an unconstitutional delegation of government authority to a private entity and an unconstitutional encroachment of authority on the power of the State of Iowa."

54.     Starting in the spring of 2024, HISA began to put significant pressure on the Iowa HBPA to voluntarily pay half of the assessment. HISA representatives told Prairie Meadows representatives that they were frustrated and angry that the Iowa

HBPA had not yet paid the 2023 or 2024 assessment and that Iowa HBPA Executive Director Jon Moss had not spoken to HISA about it.

55.     In the same conversation, HISA representatives told Prairie Meadows representatives that, if the Iowa HBPA did not pay, HISA would force Prairie Meadows to institute a "per-start fee" on all owners, meaning that each racehorse owner would pay a fee as a condition of running a race. A per-start fee is levied only against the owner of the racehorse and applies regardless of whether the horse finishes first, last, or somewhere in between.

56.     Following HISA's threat of a per-start fee, representatives of HISA and the Iowa HBPA participated in a video conference call. HISA general counsel John Roach told representatives of the Iowa HBPA, including Moss, that HISA would not institute a per-start fee if the Iowa HBPA would be willing to pay HISA all the purse money it currently had in its accounts that was generated from advance deposit wagering agreements, and that HISA would allow the Iowa HBPA to pay in arrears. Roach stated that no other track was getting this "deal" and that the Iowa HBPA should not talk to groups or racetracks about it.

57.     Two weeks later, on June 18, 2024, the Iowa HBPA emailed a counteroffer to Roach, through counsel, stating:

> The board agreed that if HISA does not institute a per-start fee this year, it will release from escrow $244,867 [for] 2023, which is half the assessment less half the amount that was erroneously included for supplements. The IA HBPA does not agree to release anything for the 2024 HISA Assessment

until a correction is made to the 2024 HISA Assessment methodology that takes out the supplement money.

58.     HISA rejected the counteroffer and, on July 3, 2024, HISA CFO Jim Gates emailed Prairie Meadows's vice president of racing, stating that "[w]e have not been able to come to a mutually agreeable resolution with the Iowa HBPA concerning the 2024 Covered Persons Allocation. Therefore, HISA is directing Prairie Meadows to collect a starter fee to fund the Covered Persons Allocation in accordance with the Horseracing Integrity and Safety Act (the "Act") and the related federal regulations." The per-start fee was estimated to generate enough revenue to cover half of Iowa's assessment.

59.     Two days later, on July 5, the Fifth Circuit ruled that the Act is unconstitutional because it delegates government enforcement authority to HISA, a private entity. See *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, ___ F.4th___, No. 23-10520, 2024 WL 3311366 (5th Cir. July 5, 2024).

60.     On July 9, HISA, through its general counsel John Roach, extended another offer to the Iowa HBPA. The Iowa HBPA had disputed HISA's total calculation for Iowa's share because HISA had included in its calculation bonus awards that are given to owners of Iowa-bred horses as "purses," thus inflating Iowa's share. Roach had previously rebuffed the idea that the calculation was incorrect but stated that if the Iowa HBPA would pay what it believes to be the correct assessment for 2023 and 2024, then HISA would not force Prairie Meadows to institute a per-start fee.

61.     The Iowa HBPA board of directors was set to consider that offer at a meeting on July 19, but, on July 12, Roach emailed an Iowa HBPA representative to say that HISA had rescinded the offer. The previous day, Bloodhorse Magazine had published an online article titled "Iowa HBPA, HISA Working Toward Assessment Deal." In the article, Iowa HBPA Executive Director Jon Moss is quoted as saying: "There are things in the rules. I thought with HISA that some of these things are supposed to be done, but it's readily apparent to us at this point that, based on what we've seen with other racetracks and other racing associations, it's you just need to negotiate, work in good faith and continue to move forward, and that's what we're trying to do."[2]

62.     In his July 12 email, Roach referenced the article and stated: "Obviously, my offer that was made in an attempt to resolve this dispute is withdrawn.  All my best, John."

63.     Plaintiffs are now forced to bring this lawsuit to stop HISA's assessments, which violate the Constitution's structure, the Due Process Clause, and the Act's requirement that assessments among covered persons be "equitable."

64.     These unconstitutional and unlawful actions are bad enough, but Plaintiffs' injuries are made worse by the fact that HISA has assessed and will continue

---

[2] Joe Perez, *Iowa HBPA, HISA Working Toward Assessment Deal*, BloodHorse, Jul. 11, 2024, available at https://www.bloodhorse.com/horse-racing/articles/278176/iowa-hbpa-hisa-working-toward-assessment-deal.

to assess Plaintiffs and other industry participants for the millions of dollars in legal fees that HISA has unnecessarily incurred and will continue to incur to defend against HISA's unlawful actions and the unconstitutional Act.

65.     In his October 17, 2022, letter to the Iowa Racing and Gaming Commission, HISA CFO Jim Gates told the Iowa agency that Iowa's assessment "includes funding to defend the four lawsuits that have been filed challenging the constitutionality of HISA." "To date," Gates wrote, "HISA has spent over $2.0 million defending these claims."

66.     The amount of legal fees HISA has incurred defending the Act against constitutional challenges has increased significantly since then, even though the Department of Justice is taking the lead on defending the Act in every lawsuit brought to date.

67.     And HISA is not hiding the fact that it passes these costs onto the very people who are exercising their constitutional rights. In a speech to the Jockey Club, HISA CEO Lisa Lazarus chastised industry participants who have challenged the constitutionality of the Act, stating that "[t]hese lawsuits are ultimately being paid for by the industry, and ironically, in part by the entities suing us," adding that "this is really a shame" and "deeply disappointing."[3]

---

[3] Available at https://jockeyclub.com/default.asp?section=RT&year=2022&area=9.

68.     It is indeed really a shame and deeply disappointing. For over thirty years, the Iowa Racing and Gaming Commission has effectively regulated the safety and integrity of thoroughbred horseracing in Iowa. And, until the point where the Act stripped the Iowa Racing and Gaming Commission of its authority and gave it to HISA, the state body was regulating all Iowa horseracing (thoroughbreds and quarter horses) for less than half the cost of what HISA is now assessing Iowa for the cost of HISA's budget.

69.     Plaintiffs request that this Court stop the unconstitutional assessments and bring HISA's unlawful reign to an end.

## COUNT I
### Violation of the United States Constitution (Private Non-Delegation Doctrine)

70.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

71.     "Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 88 (2015) (Thomas, J., concurring).  Indeed, "[w]hen it comes to private entities" exercising government power, "there is not even a fig leaf of constitutional justification." *Id.* at 62 (Alito, J., concurring).

72. The Act gives HISA, a private entity, the authority to issue taxes, or what the Act calls "fees" or "assessments," and only limits that authority by stating that the assessment must be allocated "equitably."

73. Regardless of the label (tax or fee), the Act's command that HISA "allocate equitably" the assessment is not a sufficiently intelligible principle to guide HISA's discretion. It is therefore an unconstitutional delegation of Congress's power under Article I, § 1 of the Constitution.

74. Even if such authority could have been delegated to the FTC or other government authority, Congress cannot delegate its authority or the executive's authority to a private entity under Article I, § 1 or Article II, § 1 of the Constitution.

75. Deciding what is an "equitable allocation"—that is, who should be forced to pay for HISA's budget and how much—is much more than a ministerial function. It is a discretionary, government decision that must be made by a government official or agency. Neither HISA nor its board members fit that category, and yet HISA sets the equitable allocation of the assessment among covered persons without FTC approval.

76. If anything, the experience in Iowa shows that HISA, a private entity, is merely delegating its governmental authority to *another* private entity, the racetrack that submits the "equitable allocation" proposal.

77. The Act, on its face and as applied in this case, is a "delegation in its most obnoxious form." *Carter v. Carter Coal Company*, 298 U.S. 238, 311 (1936).

78.     Highlighting the constitutional problems with the Act's structure—which is to say the problem of giving the heavy hand of governmental authority to an unaccountable private entity—is that HISA switches its roles when it is convenient.

79.     Despite the fact that HISA has been delegated sole government authority to  make an "equitable assessment" against thoroughbred racehorse owners, breeders, trainers, jockeys, and anyone else licensed by the state racing commission, HISA has declared that it is "is not subject to the Freedom of Information Act ("FOIA") or state and local open records laws" because it is "a private, independent, self-regulatory, nonprofit corporation."[4] In other words, HISA has declared that it gets to wield the power to tax or assess fees without any of the corresponding responsibilities that would normally come with it. As a result, Plaintiffs do not know what, if any, "deals" HISA has struck with other racetracks and organizations around the country to reduce their assessments or to shift the financial burden to someone else.

80.     On June 27, 2022, Senators Charles Grassley, Joni Ernst, Joe Manchin, and John Kennedy wrote to FTC Chair Lina Khan and HISA CEO Lisa Lazarus, expressing frustration with HISA's inconsistent and unpredictable application of the Act's requirements. The Senators stated that HISA's "chaotic implementation process and poor communications," "continuously changing implementation dates for new rules and regulations, and last minute delays" were causing "confusion and difficulty"

---

[4] *HISA Releases Data Disclosure Policy*, Thoroughbred Daily News, Nov. 27, 2023, available at https://www.thoroughbreddailynews.com/hisa-releases-data-disclosure-policy/.

among members of the industry. The Senators also stated that the poor implementation had created further uncertainty about "the fee structure to cover the costs" of HISA, which "risks leaving the regulated industry without the certainty and transparency they need to budget for the current and future racing seasons."

81.     In similar a letter, Congressman Markwayne Mullin asked the FTC and HISA to explain why they enforce some mandatory requirements of the Act but not others.  Specifically, Congressman Mullin asked FTC Chair Kahn and HISA CEO Lazarus: "How does the Authority and the FTC decide which parts of HISA are mandatory, like the FTC's insistence it approves or disapproves a Rule published in the Federal Register within the statutory deadline; or flexible, like the Authority's extension of the start date of for the Anti-Doping and Medication Control Program to January 2023 from the statutory date of July 1, 2022?"

82.     In a response dated August 8, 2022, Chairperson Khan stated that the FTC—as any government agency should—"takes its instructions from the Act's text, which is unambiguous and mandatory," but that the second portion of the Congressman's question—regarding HISA's treatment of the Act's mandatory commands as discretionary—"is best answered by [HISA]." In other words, the FTC refused to take responsibility for HISA's actions and inactions.

83.     Chairperson Kahn also stated the FTC "does not enforce [HISA's] approved rules."

84. The Act's private delegation of government power to tax—to equitably allocate the cost of HISA's budget among covered persons and to raise revenue by assessing them—violates the U.S. Constitution.

## COUNT II
### Violation of the Fifth Amendment, Due Process (42 U.S.C. § 1983)

85. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

86. The Act gives HISA, which is run by a board of directors that is not appointed by the President or any elected official, the authority to assess a tax or fee against Plaintiffs and other industry participants based on HISA's determination of what is equitable.

87. In this case, HISA made the determination that the Iowa assessment should be split "50-50 between the track and horsemen." That decision was not based on any factual analysis but instead solely upon the recommendation of Prairie Meadows.

88. HISA has not defined "horsemen" but has determined that this undefined group must pay half of the Iowa assessment from purse funds (which are governed by the Iowa Racing Gaming Commission and cannot be used to pay the assessment) or from a per-start fee that is assessed solely against owners, including Plaintiffs. Thus, HISA has declared that it is equitable for horse owners to pay half of the assessment, for Prairie Meadows to pay the other half, and for all other "covered persons" to pay nothing.

89.     HISA has provided no avenue to appeal its allocation decision, and when members of the Iowa HBPA spoke to the press regarding its negotiations with HISA to voluntarily make the assessment, HISA retaliated by withdrawing the offer to the Iowa HBPA.

90.     By allowing HISA (a private entity) to tax or assess a fee against racehorse owners, including Plaintiffs, without any explanation or request for input from those racehorse owners, and without any avenue to appeal or challenge that decision, Defendants have violated the Due Process Clause of the Fifth Amendment.

91.     The Act itself also violates the Due Process Clause by delegating to a private entity the government authority to levy a tax or assess a fee.

## <u>COUNT III</u>
### Violation of Article II, § 2 of the Constitution (Unlawful Appointments)

92.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

93.     If the Court determines that HISA is not a private entity but is instead a governmental entity, then the Act violates the Appointments Clause of article II, § 2.

94.     Under the Act, HISA is controlled by a board of directors whose members are not chosen by the President or any government official or employee and whose members cannot be removed by the President or any government official or employee.

95.     A governmental entity that has the authority to tax or assess fees but whose members are not chosen by nor can be removed by the President or any federal official employee violates the Appointments Clause.

## COUNT IV
**Action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (5 U.S.C. § 706)**

96.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

97.    HISA's decision to allocate the 2023 and 2024 Iowa assessment "50-50 between the track and horsemen" was not based on any evidence or objective factors but was instead arbitrary, capricious, and an abuse of discretion.

98.    Further, HISA's decision to collect the "horsemen's" half of the assessment through a per-start fee, which is paid solely by racehorse owners, is not an equitable allocation of the assessment under 15 U.S.C. § 3052(f)(3)(B).

99.    A per-start fee does not collect any taxes or fees from other covered persons under the Act, including breeders, jockeys, trainers, or other non-owners who are licensed by the Iowa Racing and Gaming Commission.

100.    HISA's decision to allocate half of Iowa's assessment to racehorse owners through a per-start fee is therefore not in accordance with law, namely 15 U.S.C. § 3052(f)(3)(B).

## COUNT IV
**Ultra Vires**

101.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

102.    HISA's decision to allocate the 2023 and 2024 Iowa assessment on a split of "50-50 between the track and horsemen" was not based on any evidence or factors and was therefore not equitably allocated.

103.    Further, HISA's decision to collect the "horsemen's" half of the assessment through a per-start fee, which is paid solely by racehorse owners, is not an equitable allocation of the assessment under 15 U.S.C. § 3052(f)(3)(B).

104.    A per-start fee does not collect any taxes or fees from other covered persons under the Act, including breeders, jockeys, trainers, or other non-owners who are licensed by the Iowa Racing and Gaming Commission.

105.    HISA's decision to allocate half of Iowa's assessment to racehorse owners through a per-start fee is therefore not in accordance 15 U.S.C. § 3052(f)(3)(B) and thus ultra vires.

## **<u>PRAYER FOR RELIEF</u>**

THEREFORE, Plaintiffs request that this Court enter judgment against Defendants and grant the following relief:

1.      A declaration that the Horseracing Safety and Integrity Act, by giving authority to a private entity to decide from whom to assess taxes and fees (and how much), violates the Constitution's private non-delegation doctrine and is therefore unconstitutional and void;

2.      A declaration that the Horseracing Safety and Integrity Act, by giving full authority to a private entity to assess taxes or fees without any right to a hearing or appeal process, and by allowing a final decision to be made by a private unaccountable board of directors, violates the Due Process Clause.

3. A declaration that the Horseracing Safety and Integrity Act, by giving taxing or fee-assessment authority to a board of directors that is not appointed by, and cannot be removed by, the President or any federal official violates the Appointments Clause;

4. A declaration that a "50-50 split" of the assessment between Prairie Meadows and "horsemen" is not an equitable allocation under 15 U.S.C. § 3052(f)(3)(B).

5. A permanent injunction prohibiting Defendants from assessing anyone under the Act;

6. A permanent injunction prohibiting Defendants from assessing anyone based on the allocation of "50-50 between the track and horsemen";

7. A permanent injunction prohibiting Defendants from instituting a per-start fee against racehorse owners;

8. An award of nominal damages to Plaintiffs;

9. Awarding Plaintiffs reasonable costs, including attorneys' fees, under 42 U.S.C. § 1988, 28 U.S.C. § 2412, or any other applicable authority; and

10. Any other and further relief as the Court deems appropriate.

DATED, this 29th day of July 2024.

Ryan G. Koopmans
**KOOPMANS LAW GROUP LLC**
500 East Court Ave., Suite 420
Des Moines, IA 50309
Telephone: (515) 978-1140
Email: ryan@koopmansgroup.com

*Counsel for Plaintiffs*